# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| ANDREW J. EISAMAN, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CAUSE NO. 1:11-CV-00229** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Andrew Eisaman appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") partially denying his application under the

Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits

("DIB") and Supplemental Security Income ("SSI").[1]  (*See* Docket # 1.)  For the following

reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Eisaman applied for SSI and DIB in early 2008, alleging disability beginning on January

31, 2006.  (Tr. 17, 152-56.)  The Commissioner denied his application initially and upon

reconsideration (Tr. 63-76), and Eisaman requested an administrative hearing (Tr. 77-78).  A

hearing was conducted by Administrative Law Judge ("ALJ") Terry Miller on December 15,

2009, at which Eisaman, who was represented by counsel; Eisaman's brothers, Phil and Paul;

and a vocational expert ("VE") testified.  (Tr. 29-58.)  On December 21, 2009, the ALJ rendered

---

[1] All parties have consented to the Magistrate Judge.  (Docket # 13); *see* 28 U.S.C. § 636(c).

a partially favorable decision to Eisaman, concluding that he was disabled beginning on March 19, 2008, but that he was not disabled prior to this date as he was able to perform past relevant work as a janitor as well as various other unskilled jobs in the economy.  (Tr. 17-23.)  The Appeals Council denied his request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6, 238-56.)

On July 12, 2011, Eisaman filed a complaint with this Court, seeking relief from the Commissioner's final decision.  (Docket # 1.)  Eisaman's sole argument on appeal is that the ALJ improperly evaluated the credibility of his testimony.  (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 15-22.)

## II.  FACTUAL BACKGROUND[2]

### A.  Background

At the time of the ALJ's decision, Eisaman was thirty-two years old (Tr. 34-35), had a high school education that included some special education (apparently due to his dyslexia) (Tr. 36; *see* Tr. 186, 260-79), and had previously worked as a meat cutter, welder, and janitor (Tr. 55, 237).  Eisaman alleges he became disabled due to schizoaffective disorder, bipolar type; obsessive compulsive disorder ("OCD"); anxiety disorder; borderline/schizoid personality disorder; and attention deficit disorder ("ADD").  (Opening Br. 2.)

### B.  Eisaman's Testimony at the Hearing

At the hearing, Eisaman testified that he lived alone in an apartment that his uncle paid for, that he had a driver's license and was able to drive, and that he had taken some classes at Ivy Tech, three of which he passed, but had flunked out in the spring of 2009.  (Tr. 36-37.)

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 671-page administrative record necessary to the decision.

As for his job history, Eisaman reported that he last worked for seven months as a welder for his uncle, but was let go in October 2007 for consistently putting on too much welding. (Tr. 38-39.) He also previously worked at a door place until he was fired for not keeping up and not remembering where the supplies were located and at a machine shop, where he was terminated because he kept falling asleep and arriving late, and had missed two days. (Tr. 39.) Eisaman's longest job was at a Meijer grocery store, where he worked for nine and a half years, primarily as a meat cutter. (Tr. 39.) Eisaman stated that, at this job, he had trouble staying on task, remembering customers' requests, sitting still long enough to complete tasks, and working at a fast enough pace. (Tr. 40-41.) He quit that job because his employer was "getting fed up" with his tardiness; he subsequently worked for his uncle and then two other relatives. (Tr. 38-40.)

Eisaman stated that, because of his conditions, such as his ADD, he is very easily distracted and anxious and finds it very hard to sit still if he is not doing something. (Tr. 42.) He confirmed that he has a history of inpatient hospitalizations (at least six in the record since December 2003), which are usually a culmination of not sleeping; mania, depression, or both; hallucinations; and hearing voices and noises. (Tr. 42-43.) Eisaman stated that his depression "puts [him] out of commission," making him not want to work or "do anything except crawl in bed and die"; he reported experiencing this depression about ten times a month. (Tr. 43.) Although he lives alone, his brother Paul keeps an eye on him and helps him clean. (Tr. 45.)

### C. Other Witness Testimony

Eisaman's brothers, Phil and Paul, also testified at the hearing. (Tr. 48-53.) Phil stated that he was Eisaman's supervisor in 2004 when Eisaman worked as a janitor at their uncle's company, SB Ventures. (Tr. 49, 55.) Phil reported that, at this job, Eisaman had very poor

attendance, that sometimes he would not show up or would leave, and that Eisaman's immediate supervisor indicated that if he had not been the owner's nephew, he would have been fired.  (Tr. 50.)  According to Phil, Eisaman left that position because the company was sold to a conglomerate, and his position was eliminated.  (Tr. 50.)

As for Paul, he indicated that he was previously Eisaman's landlord and that Eisaman allowed the place to become so messy in three months that Paul asked him to leave.  (Tr. 53.) Paul stated that as long as he has known Eisaman, "he couldn't get things done."  (Tr. 53.)

*D.  The Vocational Expert's Testimony*

An impartial VE testified at the hearing as well.  (Tr. 54-57.)  The ALJ posited to the VE the hypothetical of an individual of the same age, education, and work history as Eisaman who has no exertional limitations but is limited to unskilled work where he can understand, carry out, and do basically simple routine tasks for an eight-hour period of time; cannot do fast-paced work; can only occasionally interact with others; and cannot perform work where reading or writing is an essential part.  (Tr. 55-56.)  The VE opined that such a person could perform Eisaman's past work as a janitor as well as other light, unskilled occupations such as shirt presser, press operator, and production operator.  (Tr. 56.)  In these positions, the VE stated that a person could be absent only one to two days per month and that if the absenteeism rate were consistently at or above that rate, it would eliminate all employment.  (Tr. 56.)  Furthermore, the VE indicated that these jobs would typically have a 30-to-90 day probationary period, during which the attendance requirements would be stricter; specifically, an excused absence could incur a verbal or written warning and an unexcused absence could possibly lead to termination. (Tr. 56-57.)

*E.  Summary of the Relevant Medical Evidence of Eisaman's Mental Impairments*[3]

Between December 2003 and January 31, 2006, Eisaman was hospitalized several times due to episodes of mental instability.  (*See* Tr. 280 (hospitalized for stabilization of a manic episode in December 2003); Tr. 290-91 (hospitalized for suicidal ideation in June 2004); Tr. 304-05 (hospitalized for suicidal ideation in February 2005); Tr. 319-29 (hospitalized for increasing suicidal ideation in January 2006).)  Once he was released from the hospital following his January 2006 hospitalization, Eisaman saw Dr. Geeta Bisht of Neuropsychiatric Associates, PC—whom he had been seeing since March 2004 (Tr. 454)—in February 2006.  (Tr. 398.)  Dr. Bisht assigned him a current Global Assessment of Functioning ("GAF") of 65.[4]  Eisaman then returned to Dr. Bisht in March, April, May, August, September, and October.  (Tr. 394-98.)

In October 2006, Eisaman appeared as a walk-in at the Parkview Behavioral Health clinic, complaining of feeling "paranoid lately," being unable to sleep, looking into space, and staring at work.  (Tr. 344.)  He reported that he was still working full time, but that he stares into space and that other employees and his boss have noticed; sometimes he walks off the job.  (Tr. 344.)  Eisaman was given a preliminary diagnosis of schizoaffective disorder and assigned a GAF of 60.  (Tr. 347.)  He returned to the clinic the following month, denying suicidal thoughts but stating that he "wishes God will give [him] cancer so [he] could be out of this world"; he

---

[3] Unless otherwise necessary, this summary primarily cites the relevant medical evidence from Eisaman's alleged onset date of January 31, 2006, to March 19, 2008, the date the ALJ found him disabled.

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning.  AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000).  A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  *Id.*  A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  *Id.*  And, a GAF score of 61 to 70  reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well."  *Id.*

further reported that he had been temperamental lately, crying too much, and experiencing sporadic energy, and could not hold a job, though he took care of his daily living activities. (Tr. 339.)

Eisaman missed his November 2006 appointment with Dr. Bisht (Tr. 393), but saw her again in December, reporting depression and that he was ready for more electroconvulsive therapy ("ECT") (Tr. 392). Dr. Bisht gave him a current GAF of 45. (Tr. 392.) The following month, Dr. Bisht again treated Eisaman for depression and assigned him a GAF of 45. (Tr. 389.) During this January 2007 visit, Eisaman also reported that he was unable to work. (Tr. 389.) That same month, Dr. Prevesh Rustagi completed a Psychiatric Evaluation of Eisaman on a referral for ECT. (Tr. 350-54.) Dr. Rustagi noted that Eisaman was experiencing racing thoughts negatively affecting his ability to focus, concentrate, and learn new things. (Tr. 350.) Dr. Rustagi then assigned him a GAF of 51. (Tr. 353.)

The following month, Eisaman reported to Dr. Bisht that his mood was "ok," he was not as depressed, and he had no mood swings; his GAF score was 55. (Tr. 387.) In March, Eisaman's mood was depressed and more negative, but Dr. Bisht again assigned him a GAF of 55. (Tr. 385.) In April, May, and June, Dr. Bisht gave Eisaman GAF scores of 50. (Tr. 378-80.) Eisaman reported that he got a job in June 2007, working as a welder for four hours a day; his mood was again "ok" and his depression was in check. (Tr. 378.) By the end of July, Eisaman was still working five days a week and four-to-five hours a day as a welder; his assigned GAF score increased to 55. (Tr. 377.) Eisaman received GAF scores of 55 from Dr. Bisht again in August, October, and December. (Tr. 373, 375-76.) He no showed for his November appointment with Dr. Bisht. (Tr. 374.) Progress notes from Eisaman's December 2007

appointment indicate that he was now unemployed.  (Tr. 373.)  By the end of January 2008, Dr. Bisht's assigned GAF for Eisaman went back down to 50.  (Tr. 372.)

On March 1, 2008, Eisaman went to the emergency room, complaining of a quick throbbing feeling in his head.  (Tr. 447-48.)  The emergency room doctor assured him that he was not having a seizure and discharged him.  (Tr. 448.)  A few weeks later, on March 19, 2008, Eisaman was hospitalized for depression, auditory and visual hallucinations, and severe mood swings; Dr. Bisht completed a psychiatric evaluation of Eisaman the following day.  (Tr. 463.)

Dr. Bisht also completed a "Report of Psychiatric Status" for the Social Security Administration ("SSA") that same month (though it appears that Dr. Bisht actually finalized the report on April 3, 2008, after this March 19th hospitalization (Tr. 459)).  (Tr. 454-60.)  She noted that Eisaman's current GAF was 50 and that his highest-past-year GAF was 55.  (Tr. 454.)  She further stated that Eisaman's illnesses were schizoaffective disorder and OCD and that their onset date was August 2007.  (Tr. 454.)  When responding to the question about the specific manifestations of Eisaman's mental disorders, Dr. Bisht referred to her psychiatric evaluation for his hospitalization on March 19th.  (Tr. 455.)  She noted that, for the past four months, he has had audio and visual hallucinations, was sleeping and eating "too much," had severe mood swings, was concerned he would hurt someone if he got mad, and was paranoid that others were talking about him.  (Tr. 455.)  Dr. Bisht further described Eisaman's condition as ongoing and that he has some periods of progress, but would regress.  (Tr. 456.)  She then opined that Eisaman appears to be capable of attending to a simple work routine on a consistent basis; however, she reported that Eisaman could not continue his welding job because, according to him, his schizoaffective disorder and OCD interfered.  (Tr. 458.)

In May 2008, Dr. Galen A. Yordy conducted a consultative exam of Eisaman at the SSA's request. (Tr. 479-83.) He diagnosed Eisaman with schizoaffective disorder, bipolar type; anxiety disorder, NOS; obsessive compulsive traits; attention-deficit/hyperactivity disorder, combined type; and rule out alcohol-related disorder, NOS. (Tr. 482.) Dr. Yordy also noted that Eisaman may have difficulty maintaining employment. (Tr. 482.)

Dr. Stacia Hill, a non-examining state agency psychologist, reviewed Eisaman's records that same month, completing a "Psychiatric Review Technique" (Tr. 484-97) and "Mental Residual Functional Capacity Assessment" (Tr. 498-501). In evaluating Eisaman's functional limits, she determined that Eisaman was mildly limited in maintaining social functioning and moderately limited in maintaining concentration, persistence, or pace; however, she found no restriction in his activities of daily living and no episodes of decompensation. (Tr. 494.)

In her assessment of Eisaman's mental residual functional capacity, Dr. Hill found that he was moderately limited in his abilities to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; and complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 498-99.) When explaining her findings, Dr. Hill noted Dr. Bisht's opinion that Eisaman appears capable of a simple work routine,[5] giving that opinion controlling weight; at the same time, Dr. Hill acknowledged Eisaman's self-report that he could not continue his welding job because his mental problems interfered. (Tr. 500.) Dr. Hill further referenced Eisaman's

_____

[5] While Dr. Hill states that the "CE" opined that Eisaman appears to be capable of a simple work routine, which would seem to indicate the consultative examiner, Dr. Yordy, a review of the record indicates that this was Dr. Bisht's opinion and not Dr. Yordy's. (*See* Tr. 458 (opining that the "[p]atient appears capable of such a task," meaning a simple work routine on a consistent basis).)

statements that he wanders off a lot, was laid off from a family business because work was slow, is taking classes at a technical school, and has job hunted without success, which he believes is a result of the local labor market. (Tr. 500.)

Dr. Hill, however, found that Eisaman's allegations were not credible for the following reasons: (1) he reported a March 2008 hospitalization for auditory and visual hallucinations, but the medical evidence Dr. Hill had for that month indicated that he was hospitalized for complaints of head throbbing; (2) he reported leaving his previous employment due to mental illness, but the record indicates that he left due to slow business; (3) that he was currently looking for work; and (4) that he was currently enrolled in an auto mechanic program at Ivy Tech. (Tr. 501.) Dr. Hill also noted the range of daily activities that Eisaman is able to accomplish, including cooking, attending to his personal hygiene, and driving. (Tr. 501.) As such, Dr. Hill opined that although Eisaman could not complete complex tasks, he is able to complete repetitive tasks on a sustained basis without special consideration. (Tr. 501.) A second state agency psychologist later affirmed this assessment. (Tr. 503.)

### F. Non-Medical Evidence Pertaining to Eisaman's Mental Impairments

Beginning in December 2007—and lasting until at least March 10, 2008 (Tr. 412)—Eisaman saw a Vocational Rehabilitation ("VR") counselor. (Tr. 407-14.) During his first visit, Eisaman recounted his work history to the counselor and stated that he has been looking for jobs, but has been unsuccessful; he felt that his difficulty finding a job was due to the local labor market rather than his illness. (Tr. 408.) Regarding his previous job as a welder, Eisaman told the counselor that he was laid off because business was slow. (Tr. 408.) Although the counselor initially had trouble identifying any way Eisaman's diagnoses interfered with his

ability to work, the counselor noted that other issues were brought out during the meeting, including Eisaman's difficulties paying attention, learning new things as quickly as others, and following instructions as he misses or misunderstands them. (Tr. 408.)

In January 2008, the VR counselor spoke to Eisaman's mother on the phone. (Tr. 410.) She reported that Eisaman works hard at everything, but, since 2004, cannot keep a job for more than a short time because he cannot stay focused; she stated that her son believes this is only a temporary setback. (Tr. 410.) The following month, the counselor noted that school was going well for Eisaman and that Eisaman had not tried to find a job because school was all he could handle for now (Tr. 411); the counselor further opined that Eisaman would most likely have difficulty with full-time employment, at least on a consistent basis (Tr. 412).

Eisaman's sister, Emily, completed a "Third Party Function Report" regarding Eisaman in March 2008. She reported that it takes him all day to clean the kitchen; that he needs to be told many times to get back to doing his chores; that his conditions affect his understanding, concentration, and following instructions; and that he has trouble concentrating on a task. (Tr. 194, 196-97.)

In July 2008, Glenda Blau, a friend of Eisaman's family who also tutored Eisaman in his remedial English classes at Ivy Tech, elaborated on Emily's report. (Tr. 206-10.) Ms. Blau stated that Eisaman rarely leaves the house and accomplishes very little in the course of a normal day. (Tr. 206.) She further wrote that simple tasks such as getting a bowl of cereal or toast can take Eisaman up to an hour or more to accomplish as he moves very slowly and tends to forget what he is doing from one moment to the next. (Tr. 206.) Moreover, Ms. Blau related that Eisaman needs constant supervision to complete anything (Tr. 206); frequently fails to display

commonsense as he does not think things through (Tr. 208); and that impulsiveness impairs his ability to handle money (Tr. 209).

## III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. The Law

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[6] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## *B. The ALJ's Decision*

On December 21, 2009, the ALJ rendered the decision that ultimately became the

---

[6] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

Commissioner's final decision.  (Tr. 17-23.)  He found at step one of the five-step analysis that Eisaman had not engaged in substantial gainful activity since his alleged onset date, and, at step two, that Eisaman had the following severe impairments: a history of schizoaffective disorder, bipolar type; OCD; anxiety disorder; borderline/schizoid disorder; and a history of ADD and learning disorder/dyslexia.  (Tr. 19.)  At step three, the ALJ determined that, prior to March 19, 2008, Eisaman's impairment or combination of impairments did not meet or medically equal a listing.  (Tr. 19-20.)

Before proceeding to step four, the ALJ determined that Eisaman's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible prior to March 19, 2008, to the extent they were inconsistent with the following RFC:

> [P]rior to March 19, 2008, the date the claimant became disabled, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: limited to work where the individual can understand, remember, and carry out simple routine tasks sustained during an eight-hour workday; no fast-paced work; only occasional and routine interactions with others; and no jobs where reading and writing are an essential part of the job.

(Tr. 20.)

Moving onto step four, the ALJ found that prior to March 19, 2008, Eisaman was able to perform his past relevant work as a janitor.  (Tr. 22.)  The ALJ nevertheless proceeded to step five, noting that the VE testified that Eisaman's RFC would also accommodate the unskilled jobs of shirt presser, press operator, and production inspector.  (Tr. 22.)  As such, the ALJ determined that Eisaman was not disabled prior to March 19, 2008, and his claims for SSI and DIB prior to that date were denied.  (Tr. 23.)

*C. The ALJ's Credibility Determination Will Not Be Disturbed*

Eisaman asserts that the ALJ improperly discredited the credibility of his testimony. (Opening Br. 15-22.) Specifically, Eisaman argues that the ALJ's credibility determination is not supported by substantial evidence because the ALJ (1) failed to discuss his GAF scores, which he claims show evidence of total disability before March 19, 2008; (2) improperly considered his work history; and (3) improperly relied on the finding of the state agency psychologists that he could perform simple repetitive tasks on a sustained basis. (Opening Br. 16; Def.'s Mem. in Supp. of Comm'r's Decision 7.) Eisaman's arguments ultimately fall short of warranting a remand.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong," *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

1. The ALJ Did Not Err by Failing to Evaluate GAF Scores

Eisaman first argues that the ALJ erred when he failed to evaluate the GAF scores he received between January 31, 2006, and March 19, 2008, as they provided evidence that he was

disabled before this latter date. First, "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citation and internal quotation marks omitted); *accord Walters v. Astrue*, 444 F. App'x 913, 919 (7th Cir. 2011) (unpublished); *see Thomas v. Astrue*, No. 2:11-cv-188-PRC, 2012 WL 2130582, at *7 (N.D. Ind. June 12, 2012) ("[A] GAF score alone is not determinative of disability."); *Curry v. Astrue*, No. 3:09-CV-565 CAN, 2010 WL 4537868, at *7 (N.D. Ind. Nov. 2, 2010) ("GAF scores are more probative for assessing treatment options rather than determining functional capacity and a person's disability.").

And although "the scores may assist in formulating the claimant's residual functional capacity," *Adams v. Astrue*, No. 1:06-CV-393 RM, 2009 WL 1404675, at *4 (N.D. Ind. May 18, 2009); *see Bray v. Astrue*, No. 2:10-CV-00352, 2011 WL 3608573, at *9 (N.D. Ind. Aug. 15, 2011), they do "not reflect the clinician's opinion of functional capacity," *Denton*, 596 F.3d at 425. Nevertheless, when an ALJ cites a claimant's highest GAF score and ignores lower ones, a remand may be warranted. *See Walters*, 444 F. App'x at 919 (remanding the ALJ's decision where he cited the claimant's highest GAF scores and omitted the lower ones); *Ingle v. Astrue*, No. 10-cv-1002, 2011 WL 5834426, at *7 (S.D. Ill. Oct. 28, 2011), *report & recommendation adopted,* 2011 WL 5834273 (S.D. Ill. Nov. 21, 2011) (finding that the ALJ erred by "cherry-picking" the claimant's highest GAF score and ignoring the remaining scores); *Salinas v. Barnhart*, No. 03 c 1330, 2004 WL 1660904, at *10-11 (N.D. Ill. July 22, 2004) (same).

Here, an independent review of the record reveals that between January 31, 2006, and March 19, 2008, Eisaman was assigned seven GAFs of 50 or below (the lowest was a 45) and

nine GAFs above 50 (with the highest being a 65).[7]  The ALJ does not mention any of these

GAF scores in his decision.  But Eisaman's GAF scores do not present definitive evidence of his

disability.  Although a "GAF rating of 50 does not represent functioning within normal limits,"

*Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010), more than half of Eisaman's GAF scores

during the relevant period were above 50 (*see* Tr. 347, 353, 373, 375-77, 385, 387, 398).  Most

of these scores were between 51 and 60, a range of scores which reflect only moderate symptoms

or moderate difficulty in social, occupational, or school functioning.  AMERICAN PSYCHIATRIC

ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text

Rev. 2000).  If the ALJ had mentioned only the GAFs above 50—and ignored the numerous

GAFs of 50 or below in the record—then a remand may have been warranted.  *See Walters*, 444

F. App'x at 919; *Ingle*, 2011 WL 5834426, at *7; *Salinas*, 2004 WL 1660904, at *10-11.  Yet

that the ALJ did not mention any of Eisaman's GAF scores does not justify a remand,

particularly where such evidence could have cut either for or against Eisaman's disability claim.

As such, Eisaman's first challenge to the ALJ's credibility determination fails.

## 2.  The ALJ Properly Considered Eisaman's Work History

Next, Eisaman argues that the ALJ improperly considered his work history both before

and after his alleged onset date of January 31, 2006.  (*See* Opening Br. 18-20.)  Regarding his

work before this date, Eisaman asserts that the ALJ did not evaluate the testimony of his brother

Phil that, when Eisaman worked for their uncle's company, SB Ventures, in 2005, he wandered

off; often missed work; and was absent so much he would have been fired if he were not the

---

[7]  Specifically, Eisaman was assigned GAFs of 65 in February 2006 (Tr. 398); 60 in October 2006 (Tr. 347); 45 in December 2006 (Tr. 392); 51 and 45 in January 2007 (Tr. 353, 389); 55 in February and March of 2007 (Tr. 385, 387); 50 in April, May, and June of 2007 (Tr. 378-80); 55 in July, August, October, and December of 2007 (Tr. 373, 375-77); and 50 in January and March of 2008 (Tr. 372, 454).

owner's nephew. (Opening Br. 18-19 (citing Tr. 49-50).) But the ALJ need not discuss or make a written evaluation of every piece of evidence; at the same time, he may not select and discuss only that evidence which favors his ultimate conclusion or ignore an entire line of evidence that is contrary to the ruling. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *Anderson v. Astrue*, No. 1:10-cv-00587-SEB-MJD, 2011 WL 3739257, at *4 (S.D. Ind. Aug. 23, 2011); *Spencer v. Astrue*, No. 1:07-CV-00131, 2008 WL 1836669, at *6 (N.D. Ind. Apr. 22, 2008).

Here, the ALJ *did* mention portions of Phil's testimony, namely that Eisaman had a nervous breakdown at Meijer, after which he had difficulty concentrating, as well as his other brother's testimony that Eisaman could not get things done. (Tr. 21.) Although he did not specifically discuss Phil's testimony regarding Eisaman's absenteeism or wandering off while working for SB Ventures, the ALJ stated that it was a family business, implicitly acknowledging that some special consideration may have occurred, and otherwise mentioned his brothers' accounts of Eisaman's difficulty concentrating and "getting things done." (Tr. 21.)

And the ALJ did not conclude from Eisaman's ability to perform this job in 2005 that he was able to work between January 31, 2006, and March 19, 2008. Rather, the ALJ went on to consider Eisaman's part-time work *after* his alleged onset date. (*See* Tr. 21.) The ALJ noted that, despite his inpatient hospitalization just before his alleged onset date, Eisaman "seemed to do well thereafter," pointing to his part-time work for temporary agencies and a family-owned business in 2006 and 2007. (Tr. 21.) Regarding the family-owned business, the ALJ wrote that Eisaman was doing welding, which the VE classified as skilled work. (Tr. 21.) Ultimately, the ALJ concluded that this demonstrated that Eisaman had sufficient residual mental ability to

*attempt* to work.  (Tr. 21.)

It is proper for an ALJ to consider a claimant's daily activities as a factor when assessing the credibility of a claimant's complaints.  20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 96-7p; *see Schmidt*, 395 F.3d at 746-47 (considering claimant's performance of daily activities as a factor when discounting claimant's credibility).  And this includes the claimant's ability to perform part-time work after his alleged onset date.  *See Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) ("Although the diminished number of hours per week indicated that [the claimant] was not at his best, the fact that he could perform some work cuts against his claim that he was totally disabled.").

Here, the ALJ properly considered as a factor in his credibility analysis that in the two years following his alleged onset date, Eisaman's daily activities included performing some work; yet, he did not improperly equate this evidence with an ability to work full time.  *Compare Schmidt*, 395 F.3d at 746-47 (considering the claimant's performance of daily activities as a factor when discounting claimant's credibility), *and Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004), *with Mendez v. Barnhart*, 439 F.3d 360, 362-63 (7th Cir. 2006) (cautioning ALJs "against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home"), *and Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005).  Rather, the ALJ concluded that his part-time work in 2006 and 2007 demonstrated that he had sufficient residual mental ability to only *attempt* to work, not to work full time.  (Tr. 21.)

In any event, Eisaman's work history was not the only reason the ALJ found Eisaman's testimony not entirely credible.  *See, e.g.*, *Martz v. Astrue*, No. 1:07-CV-00219, 2008 WL 975051, at *5-6 (N.D. Ind. Apr. 8, 2008) (affirming the ALJ's credibility determination where

the ALJ considered the fact that plaintiff worked part time after her alleged onset date as just one factor in the credibility analysis). He also cited Dr. Yordy's May 2008 consultative exam report, in which Eisaman indicated that he was completing his first semester at Ivy Tech in an automotive technician training program. (Tr. 22 (citing Tr. 480).)

As to this educational history, Eisaman objects to the ALJ's failure to mention the report of Ms. Blau, a family friend, that she tutored Eisaman extensively and that he later flunked out of school. (Opening Br. 21.) But, despite Eisaman's contentions, the ALJ did acknowledge that Eisaman flunked out of Ivy Tech in the spring of 2009 (Tr. 20), a year after the ALJ found him disabled; as such, the ALJ was at least implicitly aware that Eisaman struggled with his classes. And, according to her report, Ms. Blau tutored Eisaman in remedial English (Tr. 208), which the ALJ had already recognized he was deficient in by noting both his continued problems with dyslexia and his trouble reading and writing and by assigning him a RFC that excluded jobs where reading and writing are an essential part (Tr. 20). *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (concluding that an error is harmless when it "would not affect the outcome of the case").

Additionally, the ALJ cited Eisaman's statements to the VR counselor that he was unsuccessfully looking for work, which he believed was due to the local labor market and not his illness, statements which the ALJ permissibly may consider. *See Knox v. Astrue*, 327 F. App'x 652, 656 (7th Cir. 2009) (unpublished) ("[I]t is appropriate for the ALJ to consider any representations [that the claimant] has made to state authorities and prospective employers that he can work."). The ALJ then found that these, and other, comments that Eisaman was actively looking for work showed he had a fairly stable mental state. (Tr. 21.) After considering all of

this evidence, the ALJ concluded that there was no evidence in the record to document that Eisaman was totally disabled from his alleged onset date until he was hospitalized on March 19, 2008. (Tr. 22.) And, indeed, Dr. Bisht, Eisaman's treating psychiatrist, opined that the onset date of Eisaman's schizoaffective disorder and OCD was August 2007 (Tr. 454), over a year and a half after Eisaman alleges he became disabled. Thus, the ALJ's consideration of Eisaman's work activities after his alleged onset date, as only one factor in his credibility determination, was without error.

Not to be deterred, Eisaman argues that there is not substantial evidence to support the ALJ's finding because the ALJ failed to evaluate evidence that in late 2006, he told a Parkview Behavioral Health evaluator that he stared into space while working, sometimes wandered off the job, and could not hold a job (Opening Br. 19 (citing Tr. 339, 344)); that in February 2008, his mother told his VR counselor that, since 2004, he had been unable to hold a job for more than a short time because he cannot stay focused and had trouble doing jobs on a consistent basis, which he believed was a temporary setback (Opening Br. 19-20 (citing Tr. 410)); and that in March 2008, he told Dr. Bisht that he could not hold his welding job because his schizoaffective disorder and OCD interfered (Opening Br. 19 (citing Tr. 458)).

Regarding all these statements, the ALJ is, once again, not required to discuss or make a written evaluation of every piece of evidence. *E.g.*, *Golembiewski*, 322 F.3d at 917. And the ALJ did not necessarily have to independently evaluate "redundant" testimony as it is not a separate line of evidence. *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993); *see Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996); *Herron*, 19 F.3d at 337; *Brandenburg v. Social Sec. Admin.*, No. 104CV01376DFHWTL, 2005 WL 2148119, at *6 (S.D. Ind. Aug. 2, 2005). What

Eisaman's statements to the Parkview evaluator in late 2006 and his mother's statements to the VR counselor in February 2008 essentially boil down to is that Eisaman had difficulty concentrating and staying on task and was unable to hold down jobs for a long period of time. But the ALJ specifically noted that Eisaman testified he had difficulty staying on task while working at Meijer and that he was easily distracted as well as his brothers' testimony that Eisaman had difficulty concentrating and getting things done. (Tr. 20-21.) Moreover, the ALJ noted that much of Eisaman's work in 2006 and 2007 was for temporary agencies, which are, by their nature, short-term jobs. As such, while the ALJ may not have gone into specific detail about Eisaman's difficulties holding a job or working long-term, he adequately addressed these issues and sufficiently articulated his reasoning; thus, a remand is not warranted on this basis. *See Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (emphasizing that an ALJ need not evaluate every piece of evidence in writing, but must sufficiently articulate the ALJ's assessment of the evidence to assure that the important evidence has been considered and that the ALJ's path of reasoning can be traced); *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985) ("If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough.").

As to the welding job, the ALJ noted both Eisaman's testimony that he was let go because he kept making mistakes (Tr. 20; *see* Tr. 38) and Eisaman's statements to the VR counselor that he was laid off from this job because business was slow (Tr. 21; *see* Tr. 408). Although the ALJ did not explicitly comment on this discrepancy, he was entitled to consider such inconsistent statements in determining Eisaman's credibility. *See Hill v. Astrue,* No. 1:08-cv-0740-DFH-JMS, 2009 WL 426048, at *10 (S.D. Ind. Feb. 20, 2009) (discounting a claimant's

credibility where discrepancies were noted between her testimony and her statements to her physicians); *Stubbs v. Apfel*, No. 97 C 7069, 1998 WL 547107, at *8 (N.D. Ill. Aug. 20, 1998) (same); 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4); SSR 96-7p ("One strong indication of the credibility of an individual's statements is their consistency . . . . The adjudicator must consider such factors as . . . [t]he consistency of the individual's own statements."). And the opinion of Dr. Hill, the state agency psychologist whom the ALJ relied on, specifically noted this discrepancy in finding Eisaman's allegations not credible. (Tr. 501.) As such, the ALJ's failure to mention Eisaman's third explanation for losing this welding job—that his schizoaffective disorder and OCD interfered—does not warrant a remand or constitute an entire line of evidence that the ALJ failed to examine.

Moreover, the ALJ was more than aware—and explicitly mentioned—Eisaman's testimony at the December 2009 hearing that he was let go for making too many mistakes. (Tr. 20.) Apparently, however, he chose to credit Eisaman's prior statements to his VR counselor in December 2007 that he was laid off because business was slow. (*See* Tr. 21 ("However, per the record, he was laid off from his family business in the fall of 2007 because business was slow.").) Such a determination is for the ALJ to make, and this Court will not question it. *See Clifford*, 227 F.3d at 869 (noting that the Court cannot not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's).

### 3. The ALJ Properly Relied on the Opinion of the State Agency Psychologists

Finally, Eisaman argues that the ALJ improperly relied on the opinion of Dr. Hill, a state agency psychologist, that he was fairly mentally stable and able to perform simple repetitive tasks because this opinion (1) partly relied on a mistaken discrepancy between Eisaman's self-

report of his March 2008 hospitalization and the medical records Dr. Hill had before her; (2) did not mention the purportedly contrary evidence from Eisaman's mother, sister, and family friend; and (3) failed to incorporate Eisaman's "moderate limitations" in his ability to complete a normal workday or workweek (which, according to Eisaman, the ALJ's RFC and hypothetical questions to the VE similarly failed to do). (Opening Br. 20-22.)

To review, in May 2008, Dr. Hill opined that although Eisaman "would be unable to complete complex tasks, [he] is able to complete repetitive tasks on a sustained basis without special consideration." (Tr. 501.) In reaching this conclusion, Dr. Hill found that Eisaman's allegations were not credible, partly because of what she perceived to be a discrepancy between his self-report of his most recent hospitalization in March 2008 and the medical evidence before her. (Tr. 501.) Specifically, Eisaman reported a hospitalization in March 2008 for auditory and visual hallucinations, but the medical evidence Dr. Hill had for that month indicated that he was hospitalized for complaints of head throbbing. (Tr. 501.) Although the record shows that Dr. Hill was clearly mistaken—that Eisaman was in fact hospitalized a second time in March 2008 consistent with his self-reports—this was not the only reason Dr. Hill found Eisaman not credible. She also noted his inconsistent reasons for leaving his previous employment as a welder, his then current attempts to find employment, and his enrollment in the automotive mechanic program at Ivy Tech. (Tr. 501.) And, regardless, the ALJ, who bears the final responsibility for deciding a claimant's RFC, *Lane v. Astrue*, No. 1:10-CV-28 JD, 2011 WL 3348095, at *11 (N.D. Ind. Aug. 3, 2011), was aware of, and explicitly mentioned, this March 19, 2008, hospitalization several times in his opinion (Tr. 22-23). As such, any error in this regard is harmless. *See Skarbek*, 390 F.3d at 504.

Moving onto Eisaman's argument that the ALJ failed to evaluate his mother's statements to his VR counselor and the reports of his sister and family friend, Ms. Blau, this argument as it pertains to his mother's statements has already been rejected. Regarding the reports of Eisaman's sister and family friend, an independent evaluation of their reports is not necessary because they were essentially redundant and corroborated the accounts of Eisaman and his two brothers. *See Carlson*, 999 F.2d at 181. In *Carlson*, the claimant objected to the ALJ's failure to specifically discuss his wife's testimony, but the Seventh Circuit Court of Appeals found that the testimony "essentially corroborated Carlson's account of his [symptoms] and his daily activities" and therefore was "essentially redundant." *Id.*; *see also Books*, 91 F.3d at 980 (finding that claimant's brother's testimony was not a separate line of evidence but instead "served strictly to reiterate, and thereby corroborate, [the claimant's] own testimony concerning his activities and limitations").

Here too, the reports of Eisaman's sister and family friend essentially corroborated Eisaman's own testimony, as well as that from his brothers, concerning the limitations caused by his impairments. Specifically, the ALJ considered Paul's testimony that he helps Eisaman with his apartment, has to remind him to shower, and is in charge of his medications as well as Eisaman's own testimony about his difficulty concentrating and, when he worked at Meijer, staying on task and working fast enough. (Tr. 21.) As such, the reports of Eisaman's sister and family friend indicating his difficulty completing household chores, slow work pace, trouble staying on task, and need for supervision are essentially redundant; therefore, their reports did not constitute a separate line of evidence that the ALJ needed to address.

Thus, to the extent the ALJ found Eisaman's testimony, or that of his brothers, regarding

his limitations "to be untenable . . . he necessarily found [his sister's and family friend's] supporting testimony similarly not credible." *Books*, 91 F.3d at 980. As a result, Eisaman's argument that the ALJ improperly failed to evaluate these reports is without merit and thus fails to warrant a remand of the Commissioner's final decision.

Eisaman's last challenge to the ALJ's credibility determination is that Dr. Hill's opinion, the ALJ's RFC, and his hypothetical questions to the VE failed to include Dr. Hill's finding that Eisaman was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically-based systems and to perform at a consistent pace without an unreasonable number and length of rest periods. (Opening Br. 21-22 (citing Tr. 499); Reply Br. 4-5.) Eisaman further argues that this omission warrants a remand as it provides evidence of his absenteeism; this, in turn, would affect his ability to complete the jobs the ALJ found he was capable of performing at step five since the VE testified that these jobs would have a strict probationary period where one unexcused absence could result in termination. (*See* Opening Br. 21-22.)

First, Dr. Hill's finding that Eisaman was moderately limited in his ability to complete a normal workday and workweek was a part of a worksheet accompanying her RFC opinion, in which she specifically translated her findings into a RFC opinion that Eisaman could "complete repetitive tasks on a sustained basis without special consideration," though not complex ones. (Tr. 501.) Such a limitation to repetitive—and apparently simple—work adequately incorporates Eisaman's moderate mental limitations. *See Johansen v. Barnhart*, 314 F.3d 283, 288-89 (7th Cir. 2002) (concluding that the ALJ's limitation to "low-stress, repetitive work" adequately incorporated the claimant's moderate mental limitations, which included his ability to complete a

normal workday and workweek without interruptions from psychologically-based symptoms).

Rather than using conclusory language, like merely limiting Eisaman to "unskilled work" without any elaboration, *see Jelinek v. Astrue*, 662 F.3d 805, 813-14 (7th Cir. 2011) (noting that limiting the claimant to sedentary, light, or unskilled work did not address the impact of mental limitations reflected in a doctor's opinion), the ALJ then included a hybrid of Dr. Hill's opinion that Eisaman was capable of non-complex, repetitive tasks on a sustained basis and Dr. Bisht's opinion that Eisaman could perform a simple work routine on a consistent basis (Tr. 458) in his hypothetical to the VE and his RFC, limiting Eisaman "to work where [he] can understand, remember, and *carry out simple routine tasks sustained* during an eight-hour workday; no fast-paced work; occasional and routine interactions with others; and no jobs where reading and writing are an essential part of the job."  (Tr. 20 (emphasis added); *see* Tr. 55 (posing a hypothetical to the VE of a person "limited to unskilled work where the person can understand, carry out, and do basically *simple routine tasks* for an eight hour period of time" and "no fast-paced work" (emphasis added).)  As such, although the ALJ did not explicitly mention Eisaman's moderate limitation in his ability to complete a normal workday or workweek without interruption from psychologically-based symptoms, he essentially included Dr. Hill's opinion, which specifically translated this finding into a RFC opinion and gave controlling weight to Dr. Bisht's opinion that Eisaman was capable of a simple work routine, in his own RFC, and even added more restrictive limitations such as no-fast paced work and only occasional and routine interactions with others.

And, regardless, although an ALJ may adopt a medical source's opinion concerning the claimant's ability to work, "[t]he RFC assessment is an issued reserved to the ALJ," *Moore v.*

*Astrue*, No. 1:10-CV-00423, 2011 WL 2516530, at *5 (N.D. Ind. June 23, 2011); *see* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); SSR 96-5, and "is a legal decision rather than a medical one," *Lane*, 2011 WL 3348095, at *11. Furthermore, even if the ALJ's RFC or hypothetical questions did not include this restriction, he is only required to incorporate those impairments and limitations he accepts as credible. *See Schmidt v. Astrue*, 496 F.3d 833, 846 (7th Cir. 2007).

In the end, the ALJ's failure to explicitly mention and independently evaluate every third-party report and testimony, and all the details included therein, which merely elaborated on the main limitations the ALJ recognized Eisaman had, does not detract from what the ALJ *did do.* Perfection is not necessary, *see Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."), and the Court will not entertain nitpicking of the ALJ's opinion, *see Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (explaining that when reviewing the ALJ's decision, the court will "give the opinion a commonsensical reading rather than nitpicking at it").

Therefore, when reading the ALJ's opinion as a whole, as the Court is required to do, *id.* at 370 n.5, the ALJ's credibility determination is amply supported by the evidence of record discussed above concerning Eisaman's work history and job searching and by the medical opinions encompassing the relevant time period. As such, Eisaman's various challenges to the ALJ's credibility determination ultimately amount to no more than a plea to this Court to reweigh the evidence—a task which it cannot do. *See Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000) (emphasizing that the court is not allowed to substitute its judgment for the ALJ by "reweighing evidence"); *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000) ("[W]e cannot

reweigh the evidence or substitute our own judgment for that of the ALJ.").  Because the ALJ's credibility determination, which is entitled to special deference, *Powers*, 207 F.3d at 435, was supported by substantial evidence and was not patently wrong, it will not be disturbed.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Eisaman.

SO ORDERED.

Enter for this 24th day of July, 2012.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge